**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Patricia Four, individually and as the surviving widow of Eugene Four, | ) ) ) | |
| Plaintiff, | ) ) | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY** |
| vs. | ) ) | **JUDGMENT** |
| United States of America, acting through the Bureau of Indian Affairs and the Department of the Interior, | ) ) ) ) | Case No. 1:05-cv-001 |
| Defendants. | ) | |

Before the Court is the defendants' Motion for Summary Judgment filed on March 1, 2006. The United States asserts that it is immune from suit under the discretionary function exception to the Federal Tort Claims Act. For reasons outlined below, the Court grants the motion.

**I.      BACKGROUND**

The following facts are undisputed. The plaintiff, Patricia Four ("Four"), brought this wrongful death action as the surviving spouse of Eugene Four, a 74-year-old man who was killed in a two-vehicle accident caused by a drunk driver, Lawrence J. Cheauma, Jr. The accident occurred on August 8, 2002, at 2:04 p.m., within the exterior boundaries of the Standing Rock Sioux Reservation, at the Fort Yates Exit Road in Fort Yates, North Dakota (also referred to as 94th Street or BIA Highway 31).

Four timely filed an administrative claim with the BIA on June 2, 2004. In the administrative claim, Four alleged that unnamed employees of the BIA's Office of Law Enforcement

1

Services at Standing Rock, negligently failed to respond to several 911 emergency calls reporting the drunk driving of Cheauma in the hours prior to the incident.[1] Four's administrative claim sought $1 million in wrongful death damages, but did not assert any personal injury or property damages.

The BIA police dispatch log from August 8, 2002, reveals only one report by an unidentified female at 1402 (2:02 p.m.), two minutes prior to the accident at 1404. The log entry for this call states:

> 1402    adv'd almost ran over by Jr. Cheaume his parked at College could be drunk,adv'd Ofc Mcl [Ambre McLaughlin] on call Blue Ford PICK up,no tail gate.

See Exhibit A, p. 19, (Docket No. 26). Two minutes later, at 1404 (2:04 p.m.), a BIA officer received a report from an unidentified male.

> 1404    call reported accident end of exit.ADV'D Ofc Mcl on traffic.

See Exhibit A, p. 19 (Docket No. 26).

The North Dakota State Highway Patrol and the local Sheriff were called to assist and prepare accident reports. Based on the statements in the BIA's Case Report, it appears that the decedent, Eugene Four, was traveling east on BIA Highway 31 from Sitting Bull College to Fort Yates, in a 1976 Ford pickup when he was rear-ended by the 1980 Chevy pickup truck driven by Cheauma. The area was posted with a speed limit of 30 miles per hour. As a result of the collision, Eugene Four's truck went into the south ditch, rolled and came to rest facing west. Eugene Four was found on the passenger side of his vehicle and was pronounced dead at Fort Yates Hospital

---

[1] Four alleges that numerous calls were made to BIA Law Enforcement throughout the day on August 8, 2002. Four has provided deposition testimony from Judy Village Center, who alleges that she made several calls beginning at 8:30 a.m., and from Everett Fool Bear, who alleges he heard eight or nine calls regarding a drunk driver over BIA police radio that day. The United States asserts that one phone call was made to BIA just two minutes before the accident. The Court finds that these factual disputes are not material to the discretionary function exception analysis and need not be resolved.

shortly thereafter with the cause of death as "blunt force injuries of chest due to a motor vehicle collision." Cheauma survived and was arrested by the BIA for driving under the influence. The passenger in Cheauma's vehicle (Gerald Silk) was ejected and pronounced dead at the scene.

The United States asserts that it should be granted summary judgment for three reasons: (1) the discretionary function exception to liability under the Federal Tort Claims Act bars Patricia Four's claims; (2) the United States did not have a duty to control the actions of Lawrence Cheauma, Jr.; and (3) the actions of Lawrence Cheauma, Jr. in causing the death of Eugene Four were a superceding intervening cause. Four responds by contending that (1) there are genuine issues of material fact that demonstrate that the local BIA Personnel Manual mandated intervention and that such lack of discretion removed the officer's decision from the discretionary function exception to the Federal Tort Claims Act; (2) the United States had a duty to control the actions of Lawrence Cheauma, Jr, and prevent the death of Eugene Four, Sr; and (3) the law of intervening superceding causes is no longer strong enough to dismiss Four's claim.

## II.     LEGAL DISCUSSION

### A.     STANDARD OF REVEIW

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Graning v. Sherburne County, 172 F.3d 611, 614 (8th Cir. 1999). A fact is "material" if it might affect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### B.   DISCRETIONARY FUNCTION EXCEPTION

It is well-established that Congress has waived the sovereign immunity of the United States by giving district courts jurisdiction over certain tort actions. 28 U.S.C. § 1346(b). However, Congress has excepted from this limited waiver "[a]ny claim... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If a case falls within this statutory exception to the Federal Tort Claims Act, the Court lacks subject matter jurisdiction. See Feyers v. United States, 749 F.2d 1222, 1225 (6th Cir. 1984) cert denied, 471 U.S. 1121, 1125 (1985).

"Though discretionary function is a difficult concept to specifically define, the Supreme Court has stated that it includes initiation of programs and activities as well as determinations made

by executives or administrators in establishing plans, specifications or schedules of operations." E. Ritter & Co. v. Department of Army, Corps of Engineers, 874 F.2d 1236, 1240 (8th Cir. 1989). The discretionary function exception prohibits any claim against the United States that is based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. 28 U.S.C. § 2680(a). It "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." Dykstra v. U.S Bureau of Prisons, 140 F.3d 791, 795 (8th Cir. 1998). Its purpose is to prevent "judicial second-guessing of legislative and administrative decisions grounded in social, economic, and policy through the medium of an action in tort." United States v. Gaubert, 499 U.S. 315, 323 (1991). When properly construed, it "protects only governmental actions and decisions based on considerations of public policy." Id; see Kane v. U.S.,15 F.3d 87, 89 (8th Cir. 1994) (day- to-day decisions, made in furtherance of the policy, may be protected under the exception). Therefore, its application is a jurisdictional issue which precedes any negligence analysis. Johnson v. U.S., Dept. of Interior, 949 F.2d 332, 335 (10th Cir. 1991). The applicability of the discretionary function exception is governed by the nature of the conduct at issue, rather than the status of the actor. Berkovitz v. U.S., 486 U.S. 531, 536 (1988).

The United States Supreme Court has articulated a two-part test to be applied in determining whether a particular claim falls under the discretionary function exception to the waiver of sovereign immunity. See United States v. Gaubert, 499 U.S. 315 (1991); Berkovitz by Berkovitz v. United States, 486 U.S. 531 (1988). The first part of the test requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or

choice. If so, the discretionary function exception does not apply because there was no element of judgment or choice in the conduct at issue. United States v. Gaubert, 499 U.S. 315, 322. The Supreme Court has recognized that the requirement of judgment or choice is not satisfied if there is a statute, rule, regulation or administrative policy that specifically prescribes a course of action for an employee to follow.

However, if the challenged conduct is determined to be discretionary, the second part of the Gaubert test is to determine whether the conduct is "of the kind that the discretionary function exception was designed to shield." Gaubert, 499 U.S. 315, 322-323. As previously noted, when Congress enacted the Federal Tort Claims Act, its desire was to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy. In other words, where there is room for policy judgment and decision, there is discretion of the sort protected by the Federal Tort Claims Act.

### 1) **WHETHER THE ACTION IS A MATTER OF JUDGMENT OR CHOICE FOR THE ACTING EMPLOYEE.**

The Court's initial inquiry concerning whether the action is a matter of judgment or choice for the acting Government employee is mandated by the language of the discretionary function exception. Berkowitz v. U.S., 486 U.S. 531, 536 (1988). "[C]onduct cannot be discretionary unless it involves an element of judgment or choice." Id. Thus, when a federal statute, rule, regulation, or policy specifically prescribes a course of action for an employee to follow, the exception will not apply. Id. Conversely, when no federal mandate is found, the employee's conduct is considered to be the product of judgment or choice and the Court's initial inquiry is satisfied.

From the pleadings, is it unclear whether Four is asserting negligence on the part of the dispatchers, the patrol officers, or both.[2]  The Court will view the complaint in the light most favorable to Four and examine the conduct of both the dispatchers and the patrol officers.

The Law Enforcement Services Law Enforcement Handbook addresses emergency calls in at least two different sections, both of which address the conduct of the dispatchers.  The regulations appear to be silent regarding the method or manner in which an officer on patrol is to respond to a call from a dispatcher.[3]

*Initial Call Screening*

1. When a dispatcher, or call-taker, receives a call for law enforcement services, he/she will ascertain the nature of the call and whether or not an officer is needed at the scene immediately.  To assist in making that decision, the dispatcher determines the following as quickly as possible.
    A. The nature and type of crime or incident and whether it is in progress.
    B. The location of suspect(s), involvement of weapons and their type.
    C. The nature and extent of injuries.
    D. Location of the incident and nearest landmark or cross street, if applicable.
    E. Descriptions of suspects(s), suspect vehicles(s) and direction of travel.
2. The dispatcher or call-taker receiving the call should always listen for background noises to help determine the exact nature of the situation.  Any indications of urgency or severity should be transmitted to the responding officers.

---

[2]The complaint refers to failures in providing adequate police protection, in responding to calls for police intervention, in inadequately and untimely intervention and in ultimately failing to arrest Mr. Cheauma prior to the accident.  See Complaint. (Docket No. 1).

[3]The parties have submitted various sections of the Law Enforcement Services Law Enforcement Handbook.  The Court notes that it is the plaintiff's burden to produce evidence to support a finding that a regulation sets forth a mandatory limitation on an actor's discretion.  See ALX El Dorado, Inc., v. United States, 36 F.3d 409, 411-12 (5th Cri. 1994); Johnson v. United States, 47 F. Supp. 2d 1075, 1080 (S.D. Ind. 1999).

<u>See</u> Law Enforcement Services Law Enforcement Handbook, Volume 6 Operations Support, Chapter 5 Communications, Section 4 Receiving Emergency Calls, pp. 5.4.1 - 5.4.2  (Docket No. 28, Exhibit 1).

   *Response Codes*

   1. Program administrators establish procedures for prioritizing calls and establish program guidelines to regulate officers' method of responding to calls.  These guidelines comply with applicable state law.

   2. The dispatcher assigns Code 3 classification to those calls for police service which will indicate a felony in progress or where the violator is armed, and all other requests alleging an implied or immediate threat to the safety of the person.  Examples of Code 3 calls (but not all inclusive) are:

      A. Police officer (or station) needs urgent help.
      B. Burglary in progress.
      C. Robbery in progress.
      D. Person with a deadly weapon.
      E. Serious injury accident.
      F. Riot or large disturbance with fighting or injuries or damages occurring.

<u>See</u> Law Enforcement Services Law Enforcement Handbook, Volume 5 Law Enforcement Operations, Chapter 2 Traffic Operations, Section 10 Emergency Calls, pp. 2.10.2 - 2.10.3 (Docket No. 28, Exhibit 1).

Four contends that the "Response Codes" section suggests that the BIA officers' actions were controlled by regulations or policies and therefore, are non-discretionary.  Four maintains that Code 3 emergencies require or mandate an immediate, non-discretionary response.  As a result, Four argues that the discretionary function exception of the FTCA is inapplicable.

The United States asserts that the officers' decisions  regarding responses to 911 calls involved a discretionary function or action because the officers exercised judgment or choice in deciding whether and when to respond to 911 calls for assistance.  The United States relies on the

8

"Initial Call Screening" section for support. The United States also contends that this regulation allows a dispatcher to use his or her judgment and discretion in determining whether an officer should be called to the scene immediately. Finally, the United States also contends that all law enforcement decisions include an element of discretion, and that the dispatchers' allocation of resources and prioritization of reports naturally require an element of discretion.

The regulations in question provide both mandatory and discretionary language. The "Initial Call Screening" section clearly contemplates that a dispatcher must use his or her discretion in determining whether an officer is immediately needed at a scene because the regulation sets forth a list of factors to be weighed in reaching such a decision. See Law Enforcement Services Law Enforcement Handbook, Volume 6 Operations Support, Chapter 5 Communications, Section 4 Receiving Emergency Calls, Initial Call Screening , pp. 5.4.1 - 5.4.2 (Docket No. 28, Exhibit 1). In addition, the regulations mandate that a dispatcher classify calls indicating a felony in progress, an armed violator, or implied or immediate threat of safety to the person as "Code 3" calls. See Law Enforcement Services Law Enforcement Handbook, Volume 5 Law Enforcement Operations, Chapter 2 Traffic Operations, Section 10 Emergency Calls, Response Codes, pp. 5.4.1 - 5.4.2 (Docket No. 28, Exhibit 1). When read together, the Court finds that the regulations allow a dispatcher discretion in determining whether immediate assistance is needed, but the dispatcher has no discretion in assigning a "Code 3" classification to those calls which indicate a felony in progress, an armed violator, or implied or immediate threat of safety to the person.

Even when construing Four's complaint liberally and resolving all factual disputes in her favor, the Court finds that the gravamen of her complaint is not that a dispatcher neglected to code a call as "Code 3," but rather that the dispatcher failed to treat an alleged emergency call as one

9

which required immediate assistance and that the patrol officers failed to response adequately once they received such a call. Four has failed to set forth any regulation that mandates a dispatcher's response to calls for immediate assistance. In fact, the regulations provide a method for a dispatcher to determine whether immediate assistance is needed, thus making such a decision an inherently discretionary activity. Four has also failed to set forth any regulation that mandates how a patrol officer must respond to a call for immediate assistance. As stated before, the Law Enforcement Services Law Enforcement Handbook appears to be silent on this issue. After carefully reviewing the record, the Court finds that no regulations set forth the actions of the dispatchers or patrol officers must take. In the absence of a mandatory regulation, the Court finds that the BIA dispatchers' and patrol officers' actions must be considered a product of judgment or choice. In other words, the Court finds that the BIA dispatchers and patrol officers acted within their discretion as to the calls received on August 8, 2002, and that the first step of the discretionary function exception analysis is satisfied.

**2)  WHETHER THE CONDUCT "IS OF THE KIND THAT THE DISCRETIONARY FUNCTION EXCEPTION WAS DESIGNED TO SHIELD."**

As previously noted, because the BIA's challenged conduct clearly involved an element of judgment or choice, the Court must next ascertain whether that judgment "is of the kind that the discretionary function exception was designed to shield." Berkovitz v. U.S., 486 U.S. 531, 536. The only types of judgments that the discretionary function exception was designed to shield are "governmental actions and decisions based on considerations of public policy." Gaubert, 499 U.S. 315, 323 (1991); see Rosebush v. U.S., 119 F.3d 438, 444 (8th Cir. 1997) (explaining that the requirement for a policy nexus is an objective not a subjective one). The Court must determine

whether the adjudication of Four's claim would require it to second-guess a governmental policy decision.  Id.

At one end of the spectrum are those agency decisions outside the sphere of policy analysis where the discretionary function exception provides no defense to liability.  For example, the exception would not apply in instances where a government official causes an accident due to his negligent driving.  Gaubert v. U.S., 499 U.S. 315, n. 7.  "Although driving requires the constant exercise of discretion, the official's decision in exercising that discretion can hardly be said to be grounded in regulatory policy."  Id.  In other words, the discretion exercised by a government official who was driving in a negligent manner is not the type of judgment that the discretionary exception function is intended to protect.

At the other end of the spectrum are those agency decisions where the exercise of judgment or choice is directly related to the furtherance of the agency's policy goals.  Examples of such an exercise of judgment include:  the decision of a correctional officer to place an inmate in protective custody, Dykstra v. United States Bureau of Prisons, 140 F.3d 791, 796 (8th Cir. 1998); the decision of a law enforcement officer to make an arrest, Deuser v. Vecera, 139 F.3d 1190, 1195 (8th Cir. 1998); the decision by law enforcement as to conduct an investigation or enforce the law, Georgia Casualty and Surety v. United States, 823 F.2d 260, 263 (8th Cir. 1987), Abernathy v. United States, 773 F.2d 184, 188 (8th Cir. 1985), Pooler v. United States, 787 F.2d 868, 871 (3d Cir. 1986); the decision by the United States Marshal Service to place an individual in the witness protection program, Bergmann v. United States, 689 F.2d 789, 794 (8th Cir. 1982), Lawrence v. United States, 340 F.3d 952, 958 (9th Cir. 2003); and the decisions regarding how to locate and identify the subject

of an arrest warrant and regarding whether the person apprehended is in fact the person named in the warrant, Mesa v. United States, 123 F.3d 1435, 1438 (11th Cir. 1997).

It is well-established that decisions concerning the investigation of an alleged crime are decisions protected from tort liability by the discretionary function exception. Deuser v. Vecra, 139 F.3d 1190 (8th Cir. 1998) ("Law enforcement decision of the kind involved in making or terminating an arrest must be within the discretion and judgment of enforcing officers."); Georgia Casualty and Surety Co. v. United States, 823 F.2d 260, 263 (8th Cir. 1987) ("[T]he means chosen by the Government to enforce the law are protected by the discretionary junction exception."); Abernathy v. United States, 773 F.2d 184, 188 (8th Cir. 1985) ("Although the federal government has a duty to enforce the law, the means by which it proceeds to do so are protected by the discretionary function exception to the FTCA.").

Four fails to address the second step of the discretionary function exception analysis. The United States asserts that decisions concerning the balance of the public safety with resource allocation and prioritization, especially in the context of law enforcement, are decisions protected from tort liability by the discretionary function exception. The Court agrees.

The Court concludes as a matter of law that the decisions of the BIA dispatchers and patrol officers on August 8, 2002, are related to policy analysis and public policy considerations. Such decisions implicate competing concerns of safety, cost, personnel allocation, and agency objectives. The United States Supreme Court has made it clear that the focus of the inquiry is whether the challenged actions are "susceptible to policy analysis" and not whether they were, in fact, the result of a policy analysis. Gaubert, 499 U.S. 315, 324-325. See Hughes v. United States, 110 F.3d 765 (11th Cir. 1997). The Supreme Court has also recognized that when established governmental

policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. See U.S. v. Gaubert, 499 U.S. 315, 325 (1991); Chantal v. U.S., 104 F.3d 207, 212 (8th Cir. 1997); Appley Bros. v. U.S., 7 F.3d 720, 726 (8th Cir. 1993). It is clear that the "Initial Call Screening" regulation allowed dispatchers to exercise discretion in deciding whether immediate assistance is needed. See Law Enforcement Services Law Enforcement Handbook, Volume 6 Operations Support, Chapter 5 Communications, Section 4 Receiving Emergency Calls, pp. 5.4.1 - 5.4.2 (Docket No. 28, Exhibit 1).

Based on the above reasoning, the Court concludes as a matter of law that the BIA's challenged conduct in this case is the type of conduct that the discretionary function was designed to protect. To conclude otherwise would be to engage in the type of "judicial second-guessing" that the discretionary function exemption was designed to avoid. Thus, the Court finds that the second part of the discretionary function exception analysis has also been satisfied.

### III.     CONCLUSION

The Court finds that this case falls within this statutory exception to the Federal Tort Claims Act, and thus, the Court lacks subject matter jurisdiction. As a result, the Court finds that it unnecessary to address the United States' remaining grounds for a granting summary judgment. The

Court **GRANTS** the Defendants' motion for summary judgment (Docket No. 22) and Four's complaint is **DISMISSED** for lack of subject matter jurisdiction.

**IT IS SO ORDERED.**

Dated this 10th day of May, 2006.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court